[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff-wife (PLTF) filed her complaint in May of 1995 seeking a dissolution of the marriage, alimony, counsel fees, an equitable division of the personal and real property as well as the marital debts of the parties, restoration of her maiden name and such other relief as available in law or equity. The defendant (DEFT) did not file an answer or counterclaim.
Prior to the filing of the instant action the PLTF had filed against the CT Page 8209 DEFT an "Application For Relief From Abuse" for herself and her two children from a prior marriage. An ex parte hearing was held before Axelrod, J. In her affidavit and at the hearing on her application the PLTF complained and testified that she had suffered physical abuse on two occasions and that she and her two children had also suffered verbal abuse from the DEFT. She testified further that the DEFT had threatened to kill her and that she thus feared for her life. In response to a question from Judge Axelrod, the PLTF stated that the DEFT had not as yet been served with dissolution papers. The hearing concluded with the granting of all the requests for relief contained in the PLTF's application.
Submitted in these proceedings and marked as DEFT's Exhibit 2 is the Superior Court file of this judicial district, No. 241283, Pamela Siglingerv. Richard Siglinger. This file deals with the dissolution of the PLTF's first marriage. This file has been reviewed and considered by this court in arriving at the decision herein set forth.
The parties were present in court throughout the proceedings accompanied by their respective counsel. They testified and submitted supporting exhibits. The PLTF's son also gave testimony.
On the basis of the foregoing and with due consideration given to the criteria set forth in the pertinent statutes, the following findings and conclusions are made and orders of the court entered.
1. The parties were married on September 13, 1986 in Guilford, Connecticut. The parties separated in May of 1995.
2. Both parties have resided continuously within the State of Connecticut for more than one year prior to the filing of the complaint.
3. There were no children born of this union.
4. The PLTF was previously married on October 8, 1976. This first marriage of the PLTF was terminated by the judgment of the Superior Court (Doherty, S.T.R.) on May 3, 1986.
5. There were two children born to the PLTF during her first marriage. Their names and dates of birth, respectively, are: Jason Siglinger, March 4, 1977, and Haley Siglinger, August 25, 1982. Jason was nineteen when he testified in the instant proceedings.
6. The decree of dissolution of May 3, 1986 was re-opened and modified by the court in a "Supplemental Memorandum of Decision" dated June 12, 1986. The modification was made in accordance with the terms of a written CT Page 8210 stipulation of the parties.
7. The following matters contained in the said written stipulation, as will be noted again, have some bearing on the decision in the instant case.
 a. Alimony to the wife was terminated because both parties were working full time.
 b. The husband was to immediately transfer his interest in the former family residence located on 74 Wilford Road, North Branford, Ct. There was a further stipulation that, upon a sale of the house within five years, the husband would receive forty (40%) percent of the net equity. On the other hand, if the house remained "unsold for more than five years, the wife will receive 100% of the proceeds of sale and the husband's claims shall be totally extinguished. . . ." It was also provided that the wife was to pay all mortgage payments commencing June, 1986.
 c. The husband was to pay $62.50 for the support of each child to the age of eighteen years.
8. In the Siglinger case, the original judgment provided for the selling of the house within one year thereafter with a division of the net proceeds of the sale at 60% to the wife and 40% to the husband. It is to be noted that the wife and the then small children were to continue living in the house. Further, the husband was to make the mortgage payments including taxes and in turn he was to be reimbursed from the gross proceeds of the sale of the house for one-half of such payments that he would make. Also in the original judgment the husband was obligated to pay $90.00 per week as child support together with periodic alimony of $100.00 per week until the house was sold and the proceeds divided between the parties. Following the sale of the house and the division of the net proceeds, the alimony order would be reduced to $50.00 per week for an additional period of two years.
9. The written stipulation of the parties which was incorporated in the modification of the original dissolution decree in the Siglinger case benefitted [benefited] in varying degrees both of the parties. Both were at that time working and the husband was released from his periodic alimony payments. The principal asset in the family estate was the residence of the parties. This house continues in the present proceeding to be the principal matter in contention between the parties.
10. The PLTF was born on August 22, 1956 and thus was 40 years old on August 22, 1996. The DEFT was born on April 5, 1955 and thus was 41 years old on April 14, 1996. The parties CT Page 8211 separated in May of 1995 and did not return together since that date. With respect to the education attained by the parties, the wife graduated from high school and the husband was limited to grammar school. From August 1990 to August 1993, for a period of about three years, she studied to become a court reporter and took student loan of $7,000.00 to cover the tuition payments due at the Stone Academy. She completed her course to the point that she testified as being fully capable and qualified to work as a court reporter or to do any kind of typing work as a free-lance person. In 1993 she secured employment at Amtrak and also secured medical insurance for herself and her daughter, Haley Siglinger. She further testified that she no longer required the DEFT to carry her on his medical insurance coverage. On the final financial affidavits filed by the parties, he showed health insurance with himself as the only person covered, whereas she had a different insurer and listed herself, the children and the DEFT as the persons covered
11. As to the employment skills of the parties, the following is set forth. The husband, prior to and throughout the marriage to the time of separation early in May of 1995, was the principal financial provider for the family of four. His principal occupation was that of a commercial fisherman. This was seasonal work for him. During the off season he collected unemployment compensation. At the time of the hearings in this case, the DEFT was employed as a maintenance mechanic in Branford, Connecticut. He also did some work as a laborer in construction.
12. From his current employment the DEFT has gross wages of $520.00. His deductions listed total $174.58 which includes $52.00 savings to a 401K account. The PLTF secured employment at Amtrack as a secretary earning approximately $21,000.00 by her own testimony in 1994. PLTF's Exhibit G, a copy of the parties' joint federal income tax return for 1994 reveals $41,918.00 for the two wages and salaries. Thus, the DEFT's earnings for that calendar year is approximately $20,918.00. He was during this marriage in the habit of turning his earnings over to the PLTF who in turn managed the family finances, paying the bills.
13. For the calendar year 1995, each filed separate federal tax returns. Their final separation had occurred in May of 1995. The PLTF testified that after the separation the DEFT no longer provided payment for the house mortgage nor for the real estate taxes and he confirmed this assertion. She reported her earnings CT Page 8212 at $24,095.00. He reported earnings of $21,400.00 on his separate return. However, his W-2 form reported his gross earnings at $25,869.00.
14. Returning to the 1994 joint federal tax return, the PLTF testified that there was a refund of $1066.00. Without informing the DEFT and without his signature, she deposited the joint refund check in her separate bank account.
15. The PLTF blames the DEFT for the total breakdown of the marriage. She specifies his physical and verbal abuse of herself and the children. The son, Jason, testified to several strikings with a major one in 1995 when he was struck in the face, causing an eye laceration and a possible bleeding and possible concussion. No report was made of this incident either in school or to the police. No medical assistance was sought. The PLTF accused the DEFT of striking her, causing a severe bruise to her ribs requiring her to wear a rib support as prescribed by Dr. M. Peterson. However, PLTF indicated in the beginning to her physician and to her son and to the DEFT (by his testimony) that she suffered the injury diving into the family pool.
The DEFT denied harassing and striking the PLTF and her two children. In her testimony at the hearings she did admit that she and her husband argued over minor matters.
16. I do not find that the DEFT caused the rib injury. I find that both parties contributed to the eventual breakdown of the marriage. However, while I do believe the husband was difficult to get along with, I cannot give full credence to the PLTF's testimony, as I will now explain.
17. Returning to the PLTF's first marriage, she testified in the present hearings that she bargained with her first husband to secure the modification of the original judgment, thus waiving alimony and accepting a reduction in child support so that she could get the five-year period on the house so that she could obtain it free and clear of Mr. Siglinger's claim to the 40% of the net proceeds. She was already seeing this DEFT before her divorce and had called him at work requesting him to move in with her. Within three months after the modification she married the DEFT. With his funds paying the mortgage and taxes she was able to last the required five years thus cutting off her first husband. The five-year period would have expired around June 12, 1991. For several years before and after June 1991, she had no CT Page 8213 earned income.
There are many other incidents further showing the PLTF to be one who looked to the future and made plans and to be one who would do anything to protect her house and her children for herself.
17. The DEFT helped this family a great deal. In addition to the above, his earnings provided camping attendance for five years for the son, Jason, and two years for Haley. He also supported the PLTF's schooling at Stone's Business College. He would be home around four o'clock afternoons when he was not away fishing and would prepare dinner for the family every day that the PLTF could not. An examination of the PLTF's; file shows a number of problems she was suffering from which could very well have produced friction in the home.
18. With further regard to the house, the following findings are made. Financially the DEFT provided much funding to keep the house in the family. Repairs were made to the house in the year 1990 and all the bills were paid out of the joint checking account when the only source of income was the DEFT's earnings. The PLTF claimed that she used support money for the children to pay bills of the house. This is difficult to accept because the first husband was quite delinquent in the early days, and because of other inconsistencies related by the PLTF.
19. It is agreed from the testimony of the parties that the house is in bad shape. There is need for extensive and expensive repairs to be made to save this property. Photographs have been introduced into evidence showing the condition of the house with repairs needed in many areas. It may well be beyond the ability of the PLTF to handle these repairs. There will be no funds forthcoming from the DEFT.
20. It is found that both parties are in reasonably sound health. The PLTF testified to having health problems but also that she was not losing time from work and did not require medical insurance coverage from the DEFT because she had her own. There would be no need for rehabilitative alimony because she was finished with her special education and was fully able to qualify for a court reporter's position, being a good typist. She has good earnings and is assisted now by her adult son.
21. Both parties, it must be said, have worked in various CT Page 8214 ways to maintain the house and the surrounding grounds. I find here that the DEFT did more and heavier work inside and outside the house.
22. It is necessary to note further that the PLTF had been threatened by the DEFT. The threats of some kind may have been stated but I find it very difficult to lend credence to her claim, after hearing all the evidence, that she actually feared for her life. She sought the protective order before she had the papers seeking a dissolution served upon the DEFT. They were then served right after obtaining the protective order. There are a multitude of cases unfortunately in these dissolution cases where the protective orders are not respected by one or the other of the parties and newspaper reports seem to indicate the male person to be the violator. To the DEFT's credit in this case there has been no complaint made by the PLTF of any harassing behavior against the DEFT. In fact, he testified that the PLTF requested his assistance with the pool which he refused because of the restraining order.
23. The PLTF came into the marriage owning the home outright. Two refinancings of the mortgage were carried out. The second was on August 26, 1994 and this was the major one. The principal amount of the new loan was $102,000.00. The following items were paid off: (a) two existing mortgages totalling $72,174.00, debts of the parties paid $6,033.00 and settlement charges of $5,709.00 which made a grand total of $83,916.00. This also provided $18,083.00 of new money to the parties. Among the debts of the parties paid were $1,950.00 paid to the American Student Association to reduce the PLTF's student loan; plus $1,125.00 for the PLTF covering two medical judgments, the Diagnostic Med. Lab., and Dr. Kaufman. The rest covered both parties for household expenses.
24. On the question of the monetary and non-monetary contributions of the marriage partners, I have reviewed the case of Elizabeth O'Neil v. Edward O'Neil, 13 C.A. 300 (1988) and am in complete accord with the rule enunciated and have given consideration to the reasoning set forth therein. This consideration is set forth for both parties in the orders of this court.
25. An issue arose between the parties concerning a truck which the DEFT was operating. He was accustomed to visiting the gym five days per week from 7:30 a.m. to 11:30 a.m. The parties CT Page 8215 agreed that the PLTF took the truck while the DEFT was at the gym. The PLTF then sold the truck and the DEFT conceded that she got a fair price when she sold the truck. DEFT's Exhibit 9 shows the PLTF's version of the disposition of $10,500.00 received upon the sale of the truck. There is no special credit to be given to the parties. The truck was purchased out of funds from financing of the family premises.
26. There was presented a claim of infidelity against the PLTF. This was not done by the DEFT who did testify that he did not suspect her of such or had no proof to offer. Whatever suspicions I might have or speculation I might make, I do not have sufficient evidence from which to make a finding of infidelity. Not only did the DEFT not give direct evidence of any infidelity, he did not set it up as a cause of the breakdown of the marriage.
Having weighed the testimony of all the witnesses in this case, and having examined the exhibits submitted, and again having reviewed and considered the criteria set forth in the pertinent dissolution statutes of the State, the following Orders of the Court are entered:
1. A decree dissolving the marriage of the parties on the ground of irretrievable breakdown may enter.
2. The PLTF shall have her maiden name restored to her as requested so that henceforth she may be known as Pamela Mairano.
3. The DEFT shall pay to the PLTF periodic alimony of $1.00 per year for a period of three years and which shall become payable only if the PLTF shall be incapacitated from doing any work. This alimony order shall terminate upon the first of the following events: death of either party, remarriage of the PLTF, or cohabitation by the PLTF pursuant to the statute. The three-year term is not modifiable.
4. The PLTF again seeks the return of the family residence entirely to herself. The DEFT seeks a sale of the residence and an allocation of 60% of the net proceeds to himself and 40% to the PLTF. In effect the DEFT's position is similar to that of Judge Doherty in the earlier dissolution of the PLTF's first marriage except that he seeks to reverse the percentages. The undersigned is also in accord with the position of selling the family home but not in accord with the division of the net CT Page 8216 proceeds. I will restate my position as follows: the house needs much repair work; the PLTF no longer has two rather young children to protect and care for; the DEFT is entitled to a share of the proceeds of the house as the principal estate asset and his various investments of time, effort and money in the preservation of the asset. It was testified by both of the parties that the PLTF could not have secured the last mortgage without the DEFT's signature on the loan documents. In other words, without his financial assistance and obligation to render such, no refinancing would occur. He asked for an equal ownership in the property in survivorship and the PLTF acquiesced and executed the necessary quitclaim deed.
Accordingly, the family residence of which the parties are joint owners, and is located at #74 Wilford Road in North Branford, Connecticut, shall be sold within six months from the date hereof and the net proceeds from the sale shall be divided between the parties on the basis of sixty-five per cent (65%) to the PLTF and thirty-five percent (35%) to the DEFT. It has a fair market value of about $153,000.00 and a mortgage of about $101,000.00. Pearce Company suggested a list price range of $159,900.00 and $162,000.00. No finding is made as to a listing price nor is any order issued.
The premises are to be immediately listed for sale with a realtor agreed upon by both parties in conference with the realtor. After the premises are listed at an agreed upon first listing price, the asking price shall be lowered by the realtor after consulting with the parties. The time for review of the asking price shall be not less than sixty days. The listing agreement may provide an option to the parties to terminate it if the property is not sold within the six month period.
In the event that the parties cannot agree upon a realtor or with the realtor's' suggested first listing price or reduction in the selling price at any two-month period, either party may seek the assistance of the court by filing a proper motion to the court with notice to the other party. PLTF shall cooperate with the realtor in showing the premises to prospective buyers at reasonable hours and shall follow the realtor's instructions as to showing and preparing the properties for prospective buyers to view.
Net proceeds shall be arrived at by deducting from the gross selling price the following: settlement expenses or the customary CT Page 8217 closing expenses, the existing mortgage, taxes, insurance on the residence, as well as the Home Depot obligation, and the Suburban Oil obligation. In addition, the PLTF shall continue to pay the installments of the mortgage, real estates taxes and insurance premiums until the house is sold and shall reimbursed for one-half of all such payments made commencing November 1, 1996 to the closing. Such reimbursement shall be made from the gross selling price and thus before the division of the net proceeds. The parties shall share equally the Home Depot and Suburban Oil obligations, if not paid in full from the sale of the residence.
5. Except as provided above and hereinafter, each party shall be responsible for their own liabilities as set forth on their last respective financial affidavits and any other not so listed or incurred subsequent thereto and each shall hold the other harmless with respect to such liabilities.
6. The PLTF shall retain as her sole property free of any claim by the DEFT the 1988 Toyota, any and all bank accounts, any and all deferred compensation and pension plans and her life insurance policy.
7. The DEFT shall retain as his sole property free of any claim of the PLTF, the 1985 Dodge, his life insurance policy, and all deferred compensation and pension plans as well as any bank accounts.
8. The DEFT shall pay his own counsel's fees and shall pay the sum of $1000.00 on account of the PLTF's attorney. I do not find the claim for fees by the PLTF's counsel to be unreasonable. Realistically the DEFT in this case should not be made to bear the full cost. The PLTF is employed and she is receiving the major share of the net proceeds from the sale of the house. The DEFT's share of the counsel fees shall be paid by the DEFT at the rate of $100.00 per month commencing November 15, 1996 and on the fifteenth of each month thereafter until paid in full. Upon the sale of the house the balance of the $1000.00 then due the PLTF's attorney shall be paid in full out of the DEFT's share of the net proceeds, if such share shall prove sufficient.
9. With respect to the furniture, furnishings, etc. located in the premises, the following orders are issued:
 (a) The DEFT is awarded as his sole property the following: personal clothing, his fishing poles, his filing cabinet and all CT Page 8218 personal papers, a New Bedford knife set, great-grandfather Hanke portrait, metal fish tank stand, Fred Hanke hunting gear, mother Hanke's cooking items and all items listed on DEFT's proposed order in writing as being in the garage and the recreation room. Also the DEFT's father's antique highchair.
 (b) The PLTF is hereby enjoined from in any way disturbing or disposing in any way of the property set forth in paragraph (a). The parties shall make immediate arrangements for the DEFT to retrieve any of the aforesaid property that is still located upon the premises.
 (c) No orders are entered with regard to the contents of the Chevrolet truck that PLTF took and sold.
 (d) The parties are authorized to negotiate the rugs purchased with insurance funds. Failing to agree, the rugs shall be sold and the parties shall divide the net proceeds equally. The rugs shall not be removed from the house unless by written agreement of the parties or sold before removal. The same order shall apply to the living room furniture set forth on the DEFT's proposed orders.
 (e) The following items listed on the DEFT's proposed orders and all the rest of the personal property located upon the premises is awarded to the PLTF free of any claim by the DEFT: bureau in master bedroom, kitchen set, dining room set and china cabinet, wicker highchair/stroller, white sofa, recliner, and Sony television set.
10. Each party shall provide for their own medical and dental expenses and hold the other harmless.
Counsel for the parties are requested to collaborate in the preparation and submission of an appropriate judgment file for the approval and signature of the undersigned.
John Ottaviano, Jr. Judge Trial Referee